# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4141 | **DATE** | 9/4/2003 |
| **CASE TITLE** | Coleman vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [19-1] is granted. Defendant's motion to strike certain paragraphs of plaintiff's response to defendant's statement of undisputed facts and plaintiff's L.R. 56.1 statement of additional facts [36-1] is denied as moot. Plaintiff's motion to amend response to defendant's statement of undisputed facts and plaintiff's statement of additional facts [38-1] is denied as moot. Judgment entered in favor of the defendant. All future dates are stricken, including trial date of 10/14/03.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP - 5 2003 date docketed | 41 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. Mailed by MD. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 03 SEP -4 PM 4:45 | 9/4/2003 date mailed notice | |
| MD | courtroom deputy's initials | FILED FOR DOCKETING Date/time received in central Clerk's Office | MD mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BERTHA COLEMAN,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF CHICAGO, a municipal corporation, DEPARTMENT OF HEALTH OF THE CITY OF CHICAGO<br><br>Defendant. | No. 02 C 4141<br>Judge Joan H. Lefkow<br><br>DOCKETED<br>SEP - 5 2003 |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Bertha Coleman ("Coleman"), filed a two-count complaint against defendant, City of Chicago, a municipal corporation, (the "City"), alleging that the City violated Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000(e) *et seq.*, (Count I), and the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. §§ 621 *et seq.*, by failing to hire her for the position of Program Director for the Health Department's Bureau of Public/Child Lead Prevention and instead hiring a younger, non-African American to the position. Before this court is the City's motion for summary judgment on both counts. The court has jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331, 1343, 29 U.S.C. § 626 and 42 U.S.C. § 2000e-5(f). For the reasons stated below, the court grants the City's motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS[1]

### A. Overview of the City's Hiring Procedure for the Position of Program Director

Because Coleman's claims concern the City's failure to hire her for the position of Lead Poisoning Program Director, it is appropriate to outline the City's hiring procedures. As a result

---

[1] The facts as set forth herein, taken from the parties' statements of material facts and supporting materials, are undisputed unless otherwise indicated. As with every summary judgment motion, the court accepts Coleman's version of any disputed fact where it is arguably supported by the record. *Pluta* v. *Ford Motor Co.*, 110 F. Supp. 2d 742, 744 (N.D. Ill. 2000).

2

of a 1983 court order to eliminate political considerations in the hiring of City employees, *Shakman* v. *Democratic Org. of Cook County*, 569 F. Supp. 177, 187-88 (N.D. Ill. 1983) (ordering the City to file a plan of compliance with the judgment in *Shakman* v. *Democratic Org. of Cook County*, 435 F.2d 267 (7th Cir. 1970)), the City adopted the "Detailed Hiring Provisions for Compliance With the Shakman Judgment" ("DHP"). The DHP dictates the hiring procedure for all City positions not exempted by the 1983 decree.[2] *Wilson* v. *City of Chicago*, No. 01-C-0861, 2003 WL 168640 (N.D. Ill. Jan. 23, 2003). According to the DHP, the Department of Personnel ("DOP") has the primary responsibility for screening application materials for all non-exempt position titles. (DHP, IV-1.) "Program director" is non-exempt, generic position title.[3] Any current city employee may apply for the position title of program director by filling out a "Notice of Job Opportunity" application at the City's service center or on-line. (Pl. L.R. 56.1 ¶ 48.) A current city employee may fill out a Notice of Job Opportunity application for a position title at any time, whether or not there is a specific opening. (Pl. L.R. 56.1 ¶ 48.) If an employee fills out a Notice of Job Opportunity application for the position of program director and meets the minimum qualifications, she is put on an "Eligible List" along with all other qualified applicants for the position of program director. (DHP, IV-1; Pl. L.R. ¶ 49.) An applicant's name remains on an Eligible List for two years. (Def. L.R. 56.1 ¶ 19.) After that time, the name is removed from the Eligible List and the applicant must reapply. No notice is given before a name is removed from an Eligible List. (*Id.*)

---

[2] The 1983 decree exempts certain positions, most involving the formulation and implementation of policy, from compliance. *Shakman*, 569 F. Supp. at 182-83. Neither party claims that the position for which Coleman applied is exempt from the DHP.

[3] For clarity, "program director" will refer to the generic position title, while "Program Director" will refer to the specific position in the Health Department.

To fill a specific position, the hiring department's commissioner must request and obtain permission to hire from the DOP and the Office of Management and Budget. The request to hire and its approval are documented in a Request to Hire Form - Part A. (Def. L.R. 56.1 ¶ 13.) Once a request to hire is approved, the DOP generates a current Eligible List, which should include the names of all qualified individuals who have applied for the position title within the previous two years. An active Eligible List "<u>must</u> serve as the preliminary source of applicants for class titles for which it was created." (DHP, IV-18, emphasis in original.) The DOP then applies preestablished "Certification Screening Criteria" to reduce the number of names on the Eligible List. (DHP, IV-2.) The DOP then provides the resulting "Referral List" to the hiring department as candidates to be considered for hire. (DHP, IV-2.) A hiring department is permitted to screen the Referral List and the applications of those on the list in order to select a maximum of eleven applicants to interview for a position. (Def. L.R. 56.1 ¶ 17.)

**B. Coleman's Background**

Coleman is a 49 year old African-American employee in the City's Department of Public Health ("Health Department"). (Def. L.R. 56.1 ¶ 3.) Coleman has been employed by the City since 1972 and by the Health Department since 1988. In 1991, Coleman became an Administrative Supervisor and continues to hold that position today. (Def. L.R. 56.1 ¶ 4.) Coleman's duties as an administrative supervisor consist of supervising payroll and expenses, benefits, and leaves of absence for approximately eighty employees. (Pl. L.R. 56.1 ¶ 3.) Coleman also supervises approximately eighteen clerical staff members, overseeing administrative functions including data entry of information such as inspection reports, licenses, and approved licenses. Coleman performs all performance evaluations for the eighteen employees she supervises. (Pl. L.R. 56.1 ¶ 4.) For "a couple of years," Coleman performed all the

4

administrative work for the food and dairy, nursing and environmental lead divisions of the Health Department. (Pl. L.R. 56.1 ¶ 6.)

Coleman earned a Masters Degree in Human Resources Management from National-Louis University in 1999. She also completed twenty three hours of course work toward a Masters Degree in Public Health Administration at Illinois Institute of Technology. (Pl. L.R. 56.1 ¶ 2.) In 1993 or 1994, Coleman took a course and passed an examination, which was required for becoming a licensed lead inspector or supervisor. She received her lead license from the Illinois Department of Public Health immediately after completing the course, and she maintained her lead license until 1998. (Pl. L.R. 56.1 ¶ 7.) After receiving her lead license, Coleman attended in-house training sessions. The purpose of these training sessions was to allow employees to renew their lead licenses and to stay abreast of new information relating to lead poisoning. (Pl. L.R. 56.1 ¶ 8.) In 2001, Coleman was familiar with regulations relating to lead poisoning prevention, including regulation which require residences and tenant-inhabited buildings to be lead safe. (Pl. L.R. 56.1 ¶ 9.)

### C. The City's Creation of the Position of Program Director for the Health Department's Bureau of Public/Child Lead Prevention

In September of 2000, Christine Kosmos ("Kosmos") held the position of Assistant Commissioner in the City's Health Department.[4] (Kosmos Dep. 7.) Among other things, Kosmos oversaw the City's lead program. (Pl. L.R. 56.1 ¶ 16.) In September of 2000, Anne Evens ("Evens") held the position of epidemiologist III in the Health Department. (Evens Dep. 6, 14.) In response to new lead regulations passed on September 15, 2000, Kosmos and Evens

---

[4]Coleman states that Komos held the position of Assistant Deputy Commissioner in 2001, but the City disputes this, claiming that her position was Bureau Chief. (Pl. L.R. 56.1 ¶ 15 and Def. Response.) In her deposition on March 5, 2003, Kosmos identified her current position as Assistant Commissioner and stated that she had held the position for three years. (Kosmos Dep. 7.) The court does not view this dispute as material.

5

discussed the need for a new program director in the lead division to oversee the City's compliance with the new regulations. (Pl. L.R. 56.1 ¶ 19.) In October of 2000, Alicia Alexander, an epidemiologist IV with the title "Director of Childhood Lead Poisoning Prevention," left her position in the health department. (Kosmos Dep. 26; Evens Dep. 11, 20.) Evens interviewed for the position of "Director of Childhood Lead Poisoning Prevention," an epidemiologist IV position, in January of 2001. (Errata sheet from Evens Dep. regarding pages 21-23 of Evens Dep.) She was hired for that position in early 2001. (*Id.*)

In January, 2001, Kosmos developed a job announcement for the position of "Lead Poisoning Prevention Program Director." The announcement read

> CPDH Lead Poisoning Prevention Program will be filling the position of Lead Poisoning Prevention Program Director. The job description is as follows.
> Title: Program Director - grade 17.
> Job Description: To manage the day-to-day operations of the CDPH Lead Poisonming (sic) Prevention Program. Responsibilities include: management of nearly $8 million dollars in grants and grant activities, oversee the environmental/inspectional units, medical case management activities, surveillance activities and lead screening efforts. This person will also work with various partners including IDPH, HUD, CHA, and CDC on related issues.
> MINIMUM QUALIFICATIONS: Training and Experience: Bachelor's degree required. Prefer previous related experience.
> Send resumes to: Chris Kosmos

(Pl. Ex. 3.) On January 10, 2001, Kosmos transmitted the announcement via email to the management team.

Coleman found out about the position of "Lead Poisoning Prevention Program Director" from this job announcement. (Pl. L.R. 56.1 ¶ 25.) On January 12, 2001, Coleman sent Kosmos a resume and a letter stating that she was interested in the announced position of Lead Poisoning Prevention Program Director. (Pl. L.R. 56.1 ¶ 26.) Karen Ewing ("Ewing"), Kosmos' administrative assistant, set up an interview for Coleman with Kosmos. (Pl. L.R. 56.1 ¶ 28.) On

6

January 31, 2001, Coleman interviewed with Kosmos for approximately thirty to forty minutes. (Pl. L.R. 56.1 ¶ 29.) On April 2, 2001, Coleman wrote a letter to Kosmos regarding the status of the Program Director selection process. (Pl. L.R. 56.1 ¶ 33.) Kosmos replied via email on May 3, 2001, stating that no selection had been made but that she expected a selection soon. (Pl. L.R. 56.1 ¶ 34.)

In late March, 2001, the Personnel Department received a "Request to Hire Form - Part A" from the Health Department for the title of Program Director for the Health Department's Bureau of Public/Child Lead Prevention. (Def. L.R. 56.1 ¶ 14.) Shortly after receiving the Request to Hire form, the personnel analyst assigned to the Health Department, Nancy Bracamontes ("Bracamontes"), contacted her liaison in the Health Department, Maria Carrion, and scheduled an appointment for a representative from the Health Department to screen the applicants currently on the Eligible List for the title of program director in accordance with the screening criteria listed on the Request to Hire form. (Def. L.R. 56.1 ¶ 15.) On May 17, 2001, Bracamontes generated the Eligible List for the position title of program director and organized the applications of the individuals on the list for a representative of the Health Department to screen. (Def. L.R. 56.1 ¶ 20.) It is undisputed that Bracamontes did not consider the race or age of the individuals on this list. (Id.) Coleman's name did not appear on the Eligible List.[5] (Attachment 4 to Def. Ex. E, restricted document pursuant to L.R. 26.2.) On the same day, the

---

[5] Coleman disputes that her name was not on the Eligible List generated on May 17, 2001. (Pl. Response to Def. L.R. 56.1 ¶ 22.) She states that she has documentary proof that she applied for and was qualified for the generic title "program director" in August 1998. She also states that her name was on the eligibility list for Program Director as of May 7, 1999. (Pl. L.R. 56.1 ¶ 52.) She claims that she called the DOP and was told by representatives that her name was on the Eligible List in January, 2001, in July, 2001, and in February, 2002. She argues that this is "circumstantial evidence that her name was on the list during the time in question." (Pl. Memo. In Opposition to Def. Motion to Strike, 9.) The Eligible List generated on May 17, 2001, is before the Court. Coleman's name does not appear on it. In light of the actual list's being in evidence, the circumstantial evidence does not create a genuine dispute of fact.

7

Health Department sent Ewing to the DOP at City Hall to screen the Eligible List for the position title of program director. In the presence of Bracamontes, Ewing selected five individuals to interview for the position of Program Director for the Health Department's Bureau of Public/Child Lead Prevention. (Def. L.R. 56.1 ¶ 21.) It is undisputed that Ewing did not make her selections based on race or age. (Id.) On the same day, Bracamontes generated a Referral List with the names of the five applicants selected by Ewing for the Health Department to interview. (Def. L.R. 56.1 ¶ 23.) Coleman's name did not appear on the Referral List. (Id.)

As the Director of Childhood Lead Prevention, Evens was charged with hiring the most qualified candidate from the Referral List. (Def. L.R. 56.1 ¶ 11.) After receiving the Referral List, Evens contacted the candidates from the List and scheduled interviews for those candidates interested in the position. (Def. L.R. 56.1 ¶ 25.) Evens interviewed four candidates for the Program Director position. One candidate was no longer interested in the position and declined an interview. (Def. L.R. 56.1 ¶ 27.) After interviewing each candidate, Evens filled out a Hiring Criteria form for each candidate she interviewed, rating the candidates according to the Hiring Criteria established for the position. (Def. L.R. 56.1 ¶ 28.) Evens did not interview Coleman. (Def. L.R. 56.1 ¶ 30.)

Evens rated Steven A. Mier ("Mier") as the most qualified candidate based on the quality of his previous experience in the Health Department's lead program. (Def. L.R. 56.1 ¶ 29.) It is undisputed that Evens did not base her selection on race or age. (Id.) On or about June 6, 2001, Bracamontes received the Program Director Referral List back from the Health Department along with the hiring rating forms filled out by Evens for the interviewed applicants. (Def. L.R. 56.1 ¶ 33.) These documents indicated that the Health Department selected Mier for the position of Program Director. (Def. L.R. 56.1 ¶ 34.) Mier was hired for the Program Director position

8

effective July 1, 2001. (Def. L.R. 56.1 ¶ 35.) Kosmos dictated a letter, dated July 3, 2001, to Coleman stating that the Program Director position had been filled. (Pl. L.R. 56.1 ¶ 36.)

## DISCUSSION

A plaintiff may establish race discrimination under Title VII and age discrimination under the ADEA through direct or indirect proof. *Bennett* v. *Roberts*, 295 F.3d 687, 694-95, 697-98 (7th Cir. 2002) (race discrimination claim under Title VII); *Huff* v. *UARCO, Inc.*, 122 F.3d 374, 379 (7th Cir. 1997) (age discrimination claim under the ADEA). Coleman relies on the indirect method of proof. To establish a *prima facie* case of discrimination using this method, the plaintiff must show that (1) she is a member of a protected class; (2) she applied for, and was qualified for, a vacant position; (3) the employer rejected her for the position; and (4) the employer filled the position with an individual outside of the plaintiff's protected class, or the position remained available. *Bennett*, 295 F.3d at 694. Once the plaintiff makes a *prima facie* showing, a rebuttable presumption of discrimination exists. *Millbrook* v. *IBP, Inc.*, 280 F.3d 1169, 1174 (7th Cir. 2002) (race); *Taylor* v. *Canteen Corp.*, 69 F.3d 773, 779-80 (7th Cir. 1995)(age). The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its hiring decision. *Bennett*, 295 F.3d at 694-95. If the employer satisfies this obligation, the burden of production returns to the plaintiff to demonstrate the pretextual nature of the proffered reason. *Id.* at 695.

To establish the second element of her *prima facie* case, Coleman must show that she applied for and was rejected for the position of Program Director for the Health Department's Bureau of Public/Child Lead Prevention. The City argues that summary judgment is appropriate because Coleman cannot establish this element. Coleman's name did not appear on the Eligible List Bracamontes generated for the title of Program Director on May 17, 2001. The DHP

9

dictates that active Eligible List "<u>must</u> serve as the preliminary source of applicants for class titles for which it was created." (DHP, IV-18, emphasis in original.) It is undisputed that Bracamontes did not consider the race or age of individuals on the list she generated. Therefore, the City argues that Coleman did not apply for the position of Program Director.

Coleman contends that she has established the second element of her *prima facie* case. First, she points out that she responded to Kosmos's job announcement for Program Director in the manner prescribed, interviewed with Kosmos for the job, and was led to believe by Kosmos that she was being considered for the job. Therefore, she argues that she did apply for the position. Furthermore, Coleman contends that the "contradictions" between Kosmos' written communications and her deposition testimony establish that the City's proffered reason for not hiring Coleman is pretextual. First, Coleman points out that while Kosmos claims that her interview with Coleman was for "informational" purposes only, Kosmos posted a job announcement stating that the department would be filling the position of Program Director. Second, Kosmos claims that she interviewed Coleman for the position for which Evens was hired, yet Kosmos admits that when she responded in May, 2001 to Coleman's inquiries about the Program Director position, Kosmos was referring to the position given to Mier. Because the court concludes that Coleman did not apply for the job of Program Director, the court does not address the issue of pretext.

The requirement that a plaintiff show that she actually applied for a position allegedly wrongly refused "reflects standing-like concerns" similar to those requiring the plaintiff to prove membership in a protected class. *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 523 (7th Cir. 1994). "One who does not apply for a position for which applications are required would not get the job in any event." *Id.* In determining whether an employee applied for a job, the court must first

10

examine how the employer hires, promotes, and transfers employees. *See id..* If an employer has a "formal system of posting job openings and allowing employees to apply for them," then the employee's failure to apply for an open position "would prevent her from establishing a *prima facie* case." *Box v. A&P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985). The City clearly has a "formal system" for hiring employees. The DHP requires that individuals seeking employment with the City apply to the DOP to get their name on the Eligible List for the position title for which they are applying. An active Eligible List "must serve as the preliminary source of applicants for class titles for which it was created." (DHP, IV-18, emphasis in original.) Furthermore, the City developed this formal hiring system in response to a court order. *Shakman*, 569 F. Supp. at 187-88. While Coleman insists that she called the DOP and was told by representatives that her name was on the Eligible List in January, 2001, in July, 2001, and in February, 2002, Coleman's name did not appear on the Eligible List Bracamontes generated for the title of Program Director on May 17, 2001. This may have been a mistake, but there is no evidence that it was the result of race or age discrimination by Bracamontes. Therefore, Coleman did not "apply" for the position of Program Director.

Coleman argues, however, that when an employee "applies" for a position in the manner directed by her supervisors, her failure to strictly follow standard organizational procedure is not a bar to recovery. Therefore, when Coleman responded to Kosmos's job announcement for Program Director in the manner prescribed and interviewed with Kosmos for the job, she "applied" for the job. To support this proposition, she cites two cases from the Second Circuit, *Malarkey v. Texaco, Inc.*, 983 F.2d 1204 (2[d] Cir. 1993) and *Binder v. Long Island Lighting Co.*, 57 F.3d 193 (2[d] Cir. 1995). In *Malarkey*, the Second Circuit affirmed the denial of the employer's motion for judgment notwithstanding the verdict, in part, because when "an

11

employer's discriminatory practices deter application or make application a futile endeavor," the plaintiff's failure to apply for certain positions "is not a bar to relief." 983 F.2d at 1213. The Second Circuit relied on facts indicating that the individual who recommended candidates to managers with job openings considered the plaintiff to be a problem employee and that a jury could have determined that this sealed the plaintiff off from consideration, "making [the plaintiff] virtually untouchable within the corporation, ensuring that applications by [the plaintiff] . . . would have been futile." *Id.* This case does not help Coleman because the Second Circuit found that the employer in *Malarkey* "had no formal job-posting or application system" in place when the plaintiff could have applied. *Id.* The City does have a formal application system. Furthermore, Coleman has produced no evidence that the City engaged in any discriminatory practice that deterred her from applying for the position of Program Director or that would have made her application for the position through the formal application system "futile." Nor is there evidence of exceptions to the requirement having been made for others.[6]

In *Binder*, the Second Circuit reversed the district court's grant of judgment notwithstanding the verdict because it found that the jury could have concluded that plaintiff "applied" for any available position in the company through a conversation with the vice president of human resources, with whom his superior had directed him to speak about finding another position in the company. 57 F.3d at 200. During his conversation with the vice president of human resources, the plaintiff clearly expressed his desire to find another position, the vice

---

[6]In her initial Statement of Additional Facts, Coleman claimed that the Health Department has disregarded the City's hiring policies in the past. However, she failed to cite to anything in the record to support her contention. (Pl. L.R. 56.1 ¶ 55.) Recently, she moved to amend her Statement of Additional Facts with citations to her claim in her Declaration that she has personal knowledge of at least two such events. (Coleman Decl. ¶ 22.) In her Statement of Additional Facts, Coleman provided an extensive list of duties in the Health Department. She did not state that she had any involvement in the hiring process. (Pl. L.R. 56.1 ¶ 2-6.) Therefore, the Court disregards Coleman's self-serving assertion. *See Slowiak* v. *Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993)("Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment.").

12

president asked for the plaintiff's preferences, which he gave, and the vice president told the plaintiff that he would investigate available positions. *Id.* at 196-97, 200. The Second Circuit held that the plaintiff's "failure to apply for positions through the posting process is not an absolute bar to recovery." *Id.* at 200. The court reasoned that "the jury was free to find that the [vice president]'s words and deeds suggested to [the plaintiff] that he need not apply for positions filled through the posting process, . . . because [the vice president] was already investigating these opportunities for" the plaintiff. *Id.* at 200-01. Similarly, Coleman argues that Kosmos' "words and deeds"–her announcement of a job opening and her interview with Coleman–should excuse Coleman from the application procedure mandated by the DHP.

Coleman has cited no Seventh Circuit case law that supports this conclusion. In fact, Seventh Circuit precedent leads to the opposite conclusion. The Seventh Circuit recognizes that the "causal gap between an employer's decisionmaking process and the complained-of condition of the employee" can be bridged by "something short of the formal submission of an application." *Loyd*, 25 F.3d at 523. For example, where an employer entertains applications for a certain type of job but a plaintiff is deterred or prevented from applying by the very discriminatory practices he is protesting, a plaintiff can establish a *prima facie* case if he can show that he would have applied had it not been for those practices. *See Taylor*, 69 F.3d at 781; *Babrocky v. Jewel Food Co. & Retail Meatcutters*, 773 F.2d 857, 867 (7th Cir. 1985)(*citing Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 362-71 (1977). Also, a plaintiff can establish a *prima facie* case of discrimination where an employer does not solicit and await applications but hands out promotions on its own initiative in a nonselective, serial fashion, if a plaintiff shows that the employer's decision not to approach people of her status was

13

illegitimately motivated and shows that but for such a practice she likely would have been approached. *See Loyd*, 25 F.3d at 523.

In each of these exceptions to the general rule requiring formal application, *Box*, 772 F.2d at 1376, the plaintiff can establish a *prima facie* case only if she can demonstrate that her failure to apply formally was itself caused by the discriminatory practices of the employer. Coleman must show, therefore, that some discriminatory action by the City prevented her name from appearing on the May 17 Eligible List. She has failed to do so. Coleman argues that her situation is analogous to that of the plaintiff in *Taylor*. In that case, during a meeting with representatives of the employer's management, the plaintiff was told that his position would be eliminated and that there were no other positions within the company to which he could be transferred. 69 F.3d at 777. The Seventh Circuit held that the plaintiff should not be penalized for failing to apply formally for a specific job because "he was not given any options other than retirement." *Id.* at 781. Like the plaintiff in *Taylor*, Coleman argues that she would have pursued the position of Program Director, but that she was not told that the position was available and that Kosmos actively "concealed" this fact from her. However, Kosmos did nothing to prevent or deter Coleman from applying for the position. In fact, Coleman believed that she had an application on file with the DOP. For some reason, Coleman's name did not appear on the Eligible List, but she has presented no evidence that her name did not appear on the List because of discriminatory action by the City. Therefore, she cannot establish a *prima facie* case of discrimination.

## CONCLUSION

For the reasons stated above, the City's motion for summary judgment (#19) is granted. The City's motion to strike certain paragraphs of plaintiff's response to defendant's statement of

undisputed facts and plaintiff's L.R. 56.1 statement of additional facts (#36) is denied as moot. Coleman's motion to amend response to defendant's statement of undisputed facts and plaintiff's L.R. 56.1 statement of additional facts (#38) is denied as moot. The clerk is instructed to enter judgment in favor of the defendant. All future dates are stricken. This case is terminated.

Enter: *(signature)*
JOAN HUMPHREY LEFKOW
United States District Judge

Date: September 4, 2003